IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 39911

| IN THE MATTER OF THE ESTATE OF ALMON D. MANES. | ) ) | |
|---|---|---|
| T. JESSI MILLER, | ) | 2013 Unpublished Opinion No. 457 |
| | ) | |
| Petitioner-Appellant, | ) | Filed: April 24, 2013 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| DANIEL SAMSON, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Respondent. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Idaho County. Hon. Michael J. Griffin, District Judge. Hon. Jeff P. Payne, Magistrate.

Order of the district court, on intermediate appeal from the magistrate division, affirming decision granting claim against estate, affirmed.

Clark & Feeney, Lewiston, for appellant. John C. Mitchell argued.

Thomas J. Clark, Lewiston, for respondent.

_____

MELANSON, Judge

T. Jessi Miller appeals from the district court's order affirming the magistrate's decision granting Daniel Samson's claim against the estate of Almon D. Manes. For the reasons set forth below, we affirm.

I.

FACTS AND PROCEDURE

In February 2009, Manes passed away and his stepdaughter, Miller, was appointed personal representative of Manes's estate. The estate was comprised of 160 acres, a residence, numerous outbuildings, and an extensive amount of personal property that Manes had collected over the years. Manes's personal property consisted of antiques and keepsakes intermixed with large quantities of other items that had little, if any, value. The amount of personal property,

1

along with the manner in which it was stored, required extensive time and labor to collect, catalog, and organize following Manes's death.

Shortly before Manes's death, Miller and Samson (Manes's neighbor) were visiting Manes in the hospital. Miller approached Samson and requested that he perform work on the estate. Samson initially declined this offer but, after numerous requests, agreed to provide assistance. Miller originally offered to compensate Samson with personal property from the estate. Samson expressly rejected this proposition and stated he wanted monetary compensation. Miller subsequently told Samson he would be "well compensated," and Samson agreed to that arrangement.[1] No written contract was discussed, contemplated, or agreed upon at this time.

Samson began work in February 2009, performing tasks at the direction of Miller. These tasks included sorting through the estate's extensive personal property, organizing and securing items to be kept, hauling away items to be disposed of, caring for horses, maintaining fences, putting up signs, painting, and serving as the onsite contact person and supervisor for the estate's affairs. Samson also occasionally provided security-type services, watching over the property at night to prevent theft. In summary, the work performed by Samson was time-consuming, labor-intensive, and comprehensive.

In May 2009, Miller sent Samson a document entitled "Property Management Agreement." The agreement indicated it was effective as of May 2, 2009, and purported to provide compensation to Samson solely in the form of tangible personal property from the estate. The agreement was only signed by Miller.

At trial, Samson provided uncontroverted testimony that he expressly rejected this proposed agreement because of the method of compensation it contemplated. Samson testified he desired monetary compensation and that he again communicated this to Miller. Miller then informed Samson she would prepare a new agreement. Miller never created any subsequent written agreement.

In early September 2009, Miller terminated Samson from his duties when Samson refused to dispose of certain items that Miller had requested. At this time, Samson had not received compensation for his work, nor had Miller reimbursed Samson for expenses he incurred on behalf of the estate. Samson subsequently sent a bill to Miller via regular and certified mail.

---

[1] Miller did not testify, nor present any evidence at trial, and the magistrate found Samson to be credible regarding the arrangement between himself and Miller.

The bill stated that Samson found $20 per hour to be a reasonable rate and itemized the number of hours worked per month. The bill also accounted for wear and tear on the tires of Samson's personal vehicle and for fuel costs incurred while working on behalf of the estate. The bill contained an offset for a 4-wheeler Samson agreed to keep as partial compensation.[2] Samson later testified that these figures were conservative estimates. The bill mailed by regular mail was never returned; however, the bill mailed by certified mail was returned to Samson as unclaimed/undelivered. Miller never provided compensation to Samson, and Samson subsequently filed a claim against the estate seeking $28,796.47 plus interest. The magistrate granted Samson's claim and that decision was affirmed on appeal by the district court. Miller again appeals.

## II.

## STANDARD OF REVIEW

On review of a decision of the district court, rendered in its appellate capacity, we review the decision of the district court directly. *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008). We examine the magistrate record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. *Id.* If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure. *Id.*

## III.

## ANALYSIS

Miller argues the magistrate erred in determining the parties did not have an express contract based on performance, by finding an implied-in-fact contract, by granting quantum meruit relief when this was not argued for by Samson, and by granting damages when no evidence was presented regarding reasonable value of services. Samson argues that the magistrate correctly found no express contract existed because Samson explicitly rejected Miller's proposed agreement. Samson also argues that the magistrate correctly found an implied-in-fact contract based on the conduct of the parties, acted within the boundaries of its

---

[2] Samson testified this arrangement was set in place with Manes while he was still alive.

3

equitable powers by granting quantum meruit relief, and correctly found that evidence was presented regarding the value of services.

## A.     Express Contract Based on Performance

Miller argues that, when Samson received the proposed agreement in May 2009 and continued to perform the services on the property, an express contract was formed, despite Samson's failure to sign the agreement. Samson argues this issue should be dismissed for lack of citation to authority. Samson also argues that the uncontroverted evidence at trial demonstrated he explicitly rejected this agreement.

A party waives an issue on appeal if either argument or authority is lacking. *Powell v. Sellers*, 130 Idaho 122, 128, 937 P.2d 434, 440 (Ct. App. 1997). In this case, Miller provided sparse authority in support of her first contention--that the parties formed an express contract based on partial performance. Miller cites one case in this section of her brief, *Vanderford Co., Inc. v. Knudson*, 144 Idaho 547, 558, 165 P.3d 261, 272 (2007), for the proposition that "equity does not intervene when an express contract prescribes the right to compensation." This provides no logical support to the underlying argument proffered by Miller. Therefore, Miller has not shown error by the magistrate.

However, even if we were to address this issue, Miller's argument still fails. An express contract exists where the parties explicitly agree regarding a transaction. *Cont'l Forest Prods., Inc. v. Chandler Supply Co.*, 95 Idaho 739, 743, 518 P.2d 1201, 1205 (1974). "Express" is defined as "clearly and unmistakably communicated." BLACK'S LAW DICTIONARY 620 (8th ed. 2004). In this case, the relevant inquiry is whether there was a clear and unmistakable transaction between Samson and Miller in February 2009 evidencing an express agreement. At trial, the evidence adduced demonstrated that, shortly before Manes's death, Miller had requested Samson help her deal with the property of the estate. While Samson initially turned down this offer, he eventually acquiesced. Miller first offered to compensate Samson with personal property from the estate. However, Samson informed Miller this would not be acceptable. At this point, Miller informed Samson he would be "well-compensated" and Samson thereafter agreed to perform the work. No price or rate of compensation was discussed and no written agreement was contemplated by either of the parties. Given the lack of clarity of the agreement between the parties, it cannot be said that an express agreement was formed.

4

Miller contends that, because Samson continued to perform duties listed in the proposed written agreement after he received it, a meeting of the minds occurred and an express contract was formed. This argument is without merit. The record demonstrates that the agreement outlined the tasks Samson had already been performing and those which remained that Miller desired done. Samson testified that he expressly rejected the proposition that he be compensated through property from the estate and stated he wanted payment in currency. An acceptance of an offer which varies from the terms of the offer is a rejection of the offer and is a counter proposition, which must in turn be accepted by the offeror in order to constitute a binding contract. *Brothers v. Arave*, 67 Idaho 171, 176, 174 P.2d 202, 205 (1946). Here, when Samson informed Miller he would not agree to compensation through personal property, he varied the terms of the offer and proposed to Miller a counter proposition. This constituted a rejection of the agreement. Further, the record demonstrates that Miller acknowledged Samson's rejection of the agreement and informed him that she would create a new one. However, Miller failed to present a new agreement. Therefore, the magistrate did not err in holding no express agreement existed.

**B.      Implied-in-Fact Contract**

Miller next argues that, because there was never a meeting of the minds regarding compensation, an implied-in-fact contract cannot exist and therefore the magistrate erred. Samson argues that Miller misses the key issue--whether there was an objective manifestation of a mutual intent to contract--and Samson asserts that the parties' conduct meets this standard.

The general rule is that where the conduct of the parties allows the dual inferences that one performed at the other's request and that the requesting party promised payment, then a court may find that a contract implied in fact exists. *Gray v. Tri-Way Constr. Servs., Inc.*, 147 Idaho 378, 387, 210 P.3d 63, 72 (2009). An implied-in-fact contract is grounded in the parties' agreement and tacit understanding that there is a contract. *Id.*

In this case, the record demonstrates that Miller approached Samson on numerous occasions and requested that Samson perform work. While Samson initially declined this offer, he eventually agreed and began to work on the estate. The record also demonstrates that Samson expressly rejected the idea of being paid solely through personal property from the estate and that Miller told Samson he would be "well compensated." In support of Samson's testimony regarding this issue, testimony was also provided by Steve Kalinoski that Samson stated he

5

needed money to pay bills while discussing doing the work with Miller. Miller allowed Samson to begin working on the estate knowing Samson desired monetary compensation, rather than property. By telling Samson he would be "well compensated," it appears Miller acquiesced in that arrangement.

Miller thereafter attempted to modify the arrangement between herself and Samson with the May 2009 agreement. Support of the finding that Miller did not understand the method of compensation to be property from the outset is evidenced by Miller's indication the "effective" date of the agreement was May 2009--not February when Samson began work. Further, when Samson expressed his refusal to accept property as compensation, Miller did not dispute the issue with him. Instead, she informed Samson that she would draft another agreement. While Miller never presented a subsequent agreement, the parties proceeded under this arrangement up until September 2009, at which time Miller "terminated" Samson from working on the estate.[3] While the conduct in this case did not give rise to an express contract, it allows for the dual inference that Samson performed at Miller's request and that Miller promised Samson payment.

Miller also contends that, because an implied-in-fact contract requires a meeting of the minds, the parties' lack of an express agreement on a method of payment prevented the formation of such a contract. However, Miller conflates the requirements for an express agreement with those necessary for an implied-in-fact contract. *Cf. Clayson v. Zebe*, 153 Idaho 228, 235, 280 P.3d 731, 738 (2012) (rejecting the argument that in order to find an implied-in-fact contract, a claimant must prove all the elements of a contract, including a common understanding of all the terms). The actions of both parties demonstrate a tacit understanding that there was a contract. Therefore, the magistrate did not err in holding that an implied-in-fact contract existed between the parties.

Miller also argues that the magistrate erred by granting quantum meruit relief because Samson never requested such relief. Samson argues this issue should be dismissed for lack of citation to authority. A party waives an issue on appeal if either argument or authority is lacking. *Powell*, 130 Idaho at 128, 937 P.2d at 440. Miller fails to provide citation to any authority for this issue and, therefore, Miller has not shown error by the magistrate.

---

[3] The letter stated, in part, "you are free from any duty or obligation concerning the Manes estate." This further sheds light on the intent of the parties to be in a contractual relationship to one another.

However, even if we were to address this issue, Miller's argument still fails. When a party successfully demonstrates an implied-in-fact contract, it is necessary to measure damages and provide a remedy. Idaho law recognizes quantum meruit as the remedy for an implied-in-fact contract. *Gray*, 147 Idaho at 387, 210 P.3d at 72 (doctrine of quantum meruit is a remedy for an implied-in-fact contract); *Bischoff v. Quong-Watkins Props.*, 113 Idaho 826, 829, 748 P.2d 410, 413 (Ct. App. 1987) (quantum meruit is an equitable restitutionary remedy, based on an implied-in-fact contract, that is used to compensate a person who has performed services at the request of another). It was not necessary for Samson to expressly state he was seeking this remedy and, thus, the magistrate did not err in granting such relief.

## C.     Reasonable Value of Services

Miller contends that "at no time during the trial did Samson ever put on any evidence that $20 an hour was a reasonable rate for the services he provided."[4] Miller also argues that Samson never testified he was requesting the compensation the magistrate ultimately granted--$20 per hour. The record disproves this allegation.

Exhibit 9-A, admitted into evidence, set forth the rate of compensation Samson sought. Specifically, it states the following:

> You promised several times to pay my expenses and compensate me for my time working on the Almon Manes Estate. As we agreed, I was to have the four-wheeler as part of my compensation as well as any other items we could agree to. I've been really patient about all this, and looking at your letter from September 2nd it looks to me like you are trying to renegotiate after all the hard hard work I've done. That's not fair. What is fair, I think is $20 per hour. I have been everything from a ranch hand, to an estate manager, negotiator, teamster, trash hauler, moving company, salesman and even a security guard.

Exhibit 9 also itemized the hours worked each month from Samson's start of work in February through August 2009. Samson testified that these figures represented a low estimate of the hours worked.

Further, numerous witnesses testified as to the rates they charge for providing services similar to that which Samson provided. Dewey Bailey testified that he had fed horses in the past and typically charged $50 per hour if using a tractor and fuel and $25 per hour if working

---

[4]     We note that Miller appears to assume that testimony regarding the reasonable value of services needs to expressly state those words. Miller is incorrect and no special invocation of words is necessary when presenting the reasonable value of services rendered.

without the tractor. Ed Groseclose testified he was in the salvage business and has experience in working for estates, sorting through property. He testified that he estimated the Manes estate was about a three-month job for him and around three employees. Groseclose testified that $80 per hour would be on the low end for sorting through the materials--an estimate just for him and one employee with machinery. Groseclose further testified that for a two-man crew without any machinery, he would charge $10 per hour for the employee and $15 per hour for him to work as supervisor. Orville Martin testified that he helped clean up the estate using his front-end loader and was paid around $3,400 to $3,500 for two weeks work (including use of his equipment). Lynn Blees, a former police officer, testified that he had provided security for a drive-in theater and charged $25 per hour. William Howell testified he had experience in the moving/hauling business and was paid around $8 per hour. He also testified that he had done farmhand work before and also received $8 per hour. Zane Cunningham testified he had worked on another estate, cataloging items, and was compensated $4,000--15 percent of the estate sale. Thus, contrary to Miller's assertion, there was ample evidence presented regarding the reasonable value of services rendered by Samson. None of this evidence was challenged by Miller at trial, and the magistrate did not err in finding $20 per hour to be a reasonable rate of compensation for Samson.

**D.     Attorney Fees**

Samson argues that he is entitled to attorney fees under I.C. § 12-121 because Miller's appeal is baseless and frivolous. An award of attorney fees may be granted under I.C. § 12-121 and I.A.R. 41 to the prevailing party and such an award is appropriate when the court is left with the abiding belief that the appeal has been brought or defended frivolously, unreasonably, or without foundation. *Rendon v. Paskett*, 126 Idaho 944, 945, 894 P.2d 775, 776 (Ct. App. 1995). To receive an I.C. § 12–121 award of fees, the entire appeal must have been pursued frivolously, unreasonably, and without foundation. *Carrillo v. Boise Tire Co., Inc.*, 152 Idaho 741, 756, 274 P.3d 1256, 1271 (2012). Because Miller did not testify or present any witnesses opposing the testimony adduced by Samson, the evidence at trial was largely uncontroverted. Miller simply asks this Court to reweigh the evidence from trial. We conclude that the entire appeal has been pursued frivolously, unreasonably, and without foundation. Therefore, we award Samson attorney fees as the prevailing party.

8

**IV.**

**CONCLUSION**

While the parties failed to enter into an express agreement, their conduct rose to the level sufficient for an implied-in-fact contract. Further, Samson did not need to expressly state he was seeking quantum meruit relief. Samson also produced sufficient evidence at trial regarding the reasonable value of the services he provided. Therefore, the district court's order affirming the magistrate's decision granting Samson's claim against the estate of Manes is affirmed. Costs and attorney fees are awarded to Samson as the prevailing party.

Judge LANSING and Judge GRATTON, **CONCUR.**