**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 38471**

| | | |
|---|---|---|
| GAYLEN CLAYSON, | ) | |
| | ) | **Boise, May 2012 Term** |
| Plaintiff-Counterdefendant-Respondent, | ) | |
| | ) | **2012 Opinion No. 107** |
| v. | ) | |
| | ) | **Filed: July 2, 2012** |
| DON ZEBE, RICK LAWSON, and LAZE, | ) | |
| LLC, | ) | **Stephen Kenyon, Clerk** |
| | ) | |
| Defendants-Counterclaimants- | ) | |
| Appellants. | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Hon. Stephen S. Dunn, District Judge.

The judgment of the district court is <u>affirmed</u>.

Cooper & Larsen, Pocatello, for appellants. Gary L. Cooper argued.

Atkin Law Offices, P.C., Bountiful, Utah, for respondent. Blake S. Atkin argued.

_____

HORTON, Justice.

This appeal arises from Gaylen Clayson's attempt to purchase a restaurant and cheese factory in Thayne, Wyoming. Prior to making a formal offer on the property, Clayson was granted access to the property in order to begin operating the restaurant and refurbishing the factory. Clayson's effort to purchase the subject property ultimately failed, and Don Zebe (Don) and Rick Lawson (referred to individually as Don or Rick, collectively as Zebe) subsequently purchased the property. Clayson then filed a breach of contract action against Zebe, alleging the existence of both express and implied contracts entitling Clayson to compensation for the pre-purchase work Clayson had performed on the property. The district court partially granted Zebe's motion for summary judgment, holding that there was no express contract between the parties. After a bench trial, the district court determined that the parties' conduct created both implied-in-fact and implied-in-law contracts, which required Zebe to reimburse Clayson $97,310.94 for costs he incurred while working on the subject property.

1

Zebe appeals, arguing that the district court erred because Zebe neither requested Clayson's performance nor received any benefit as a result of Clayson's work on the property. Zebe asks this Court to vacate the judgment of the district court and remand the matter for entry of judgment in their favor. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Clayson entered into discussions to purchase the Star Valley Cheese Plant (Plant) in Thayne, Wyoming, from Morris Farinella. Prior to entering into any contract, Farinella gave Clayson permission to take over operation of the restaurant attached to the Plant. On July 1, 2008, Clayson began living at the Plant to manage the restaurant and supervise the cleaning and refurbishing of the cheese factory. According to Clayson, he worked ten to twelve hours per day, six days per week from July 1, 2008, until October 8, 2008. He hired and supervised workers that performed refurbishing tasks at the Plant, which included cleaning, plaster repair, painting, floor resurfacing, and removing unnecessary equipment. Around the end of July 2008, Clayson hired Dairy Systems Company, Inc., (Dairy Systems) to upgrade the electrical system at the Plant, for which Clayson paid Dairy Systems $50,000. Overall, Clayson claims he incurred approximately $150,000 in expenses to refurbish the Plant.

A mutual friend introduced Clayson to Don and Rick sometime in the summer of 2008. Don, a real estate agent, initially became involved in the transaction to help Clayson prepare a business plan to assist in obtaining financing. Rick is an accountant who performed the financial analysis included in the business plan. At some point, Don and Rick became interested in participating in owning and operating the Plant with Clayson.

On October 2, 2008, Clayson, Don, and Rick formed a Wyoming limited liability company known as SVC, LLC (SVC), with the expectation that the three would jointly own and operate the Plant. On October 8, 2008, Clayson called Rick and requested assistance meeting the restaurant payroll. The parties dispute the exact content of that conversation, but Clayson contends that Rick agreed to reimburse Clayson for the refurbishment expenses he incurred if Clayson would withdraw from the plan to own and operate the Plant. The same day, Clayson stopped working on the Plant and left the premises. After the conversation with Clayson, Rick had the SVC articles of incorporation amended to remove Clayson's name. Clayson testified that shortly after the phone call between himself and Rick, both Don and Rick confirmed that they

2

would pay Clayson's proved refurbishment expenses once they obtained financing for the purchase.

Clayson entered into a purchase and sale agreement (Agreement) on October 17, 2008, in which he agreed to purchase the Plant for $800,000. Neither Don nor Rick was a party to the Agreement, but Clayson assigned his interest in the Agreement to SVC on November 4, 2008. The assignment was made by way of an addendum to the Agreement and is silent as to consideration.

After Clayson assigned the Agreement to SVC, Don made several statements about his intention to pay Clayson, including the following: On January 14, 2009, Don emailed the real estate agent handling the transaction for the Plant and stated he and Rick planned to "absorb" the cost of Clayson's refurbishments, including electrical work. In order to obtain their own financing, Don and Rick also submitted a business plan to their lender, which falsely represented that SVC had already paid Dairy Systems for its work. Additionally, Don sent three emails to Dairy Systems in which he indicated that he intended to pay Dairy Systems for the work it had done at Clayson's request. SVC eventually did purchase the Plant, closing the transaction on February 24, 2009.

Clayson filed his initial complaint on June 9, 2009, alleging breach of contract and, alternatively, unjust enrichment, along with several unrelated claims. The district court granted partial summary judgment in favor of Zebe, dismissing all of Clayson's claims except the claim for reimbursement under either an implied-in-fact or implied-in-law contract. The district court dismissed Clayson's claim of breach of an express contract, finding that there was no evidence that the parties had achieved a meeting of the minds as to all terms of the contract. After a court trial, the district court found that both implied-in-law and implied-in-fact contracts existed and awarded Clayson damages totaling $97,310.24. Zebe timely appealed.

## II. STANDARD OF REVIEW

Both quantum meruit (implied-in-fact contracts) and unjust enrichment (implied–in-law contracts) are "measures of equitable recovery." *Farrell v. Whiteman* (*Farrell I*), 146 Idaho 604, 612, 200 P.3d 1153, 1161 (2009) (citing *Great Plains Equip., Inc. v. Nw. Pipeline Corp.,* 132 Idaho 754, 767, 979 P.2d 627, 640 (1999)). "The application of equitable remedies is a question of fact because it requires a balancing of the parties' equities." *Farrell v. Whiteman* (*Farrell II*), 152 Idaho 190, ___, 268 P.3d 458, 462 (2012) (citing *O'Connor v. Harger Const., Inc.,* 145

3

Idaho 904, 909, 188 P.3d 846, 851 (2008)). "In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon . . . ." I.R.C.P. 52(a). When reviewing a district court's decision after a trial without a jury, this Court's review of the decision:

> [I]s limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. A district court's findings of fact in a bench trial will be liberally construed on appeal in favor of the judgment entered, in view of the district court's role as trier of fact. It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses. We will not substitute our view of the facts for the view of the district court. Instead, where findings of fact are based on substantial evidence, even if the evidence is conflicting, those findings will not be overturned on appeal. We exercise free review over the lower court's conclusions of law, however, to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found.

*Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 706-07, 52 P.3d 848, 851-52 (2002) (quoting *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.,* 135 Idaho 518, 521, 20 P.3d 702, 705 (2001)).

### III. ANALYSIS

**A. The district court's finding of an implied-in-fact contract is supported by substantial and competent evidence.**

Zebe makes two primary arguments in support of the contention that the district court erred. First, Zebe argues that the district court misapplied the law in finding an implied-in-fact contract because Clayson did not perform the refurbishment work at Zebe's request. The second argument is that the court erred in finding that the parties' conduct implied the existence of a contract because there was no evidence that the parties had a common understanding of the agreement.

An implied-in-fact contract exists where "there is no express agreement[,] but the conduct of the parties implies an agreement from which an obligation in contract exists." *Fox*, 137 Idaho at 707, 52 P.3d at 852 (quoting *Cont'l Forest Prods., Inc. v. Chandler Supp. Co.,* 95 Idaho 739, 743, 518 P.2d 1201, 1205 (1974)). We have held that "[a]n implied in fact contract is defined as one where the terms and existence of the contract are manifested by the conduct of the parties with the request of one party and the performance by the other often being inferred from the circumstances attending the performance." *Id.* at 708, 52 P.3d at 853 (citing *Farnworth v. Femling,* 125 Idaho 283, 287, 869 P.2d 1378, 1382 (1994)). Therefore, we have stated the

4

general rule as follows: "where the conduct of the parties allows the dual inferences that one performed at the other's request and that the requesting party promised payment, then the court may find a contract implied in fact." *Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 387, 210 P.3d 63, 72 (2009) (quoting *Homes by Bell-Hi, Inc. v. Wood,* 110 Idaho 319, 321, 715 P.2d 989, 991 (1986)).

### 1. The district court's finding did not require proof that Clayson performed the refurbishment work at Zebe's request.

As the district court noted below, Zebe's argument that no implied-in-fact contract can exist because Clayson did not perform the refurbishment at Zebe's request "misses the mark" because that is not the basis of the district court's decision. The district court expressly stated that it did not find an implied-in-fact contract based upon Zebe's request that Clayson refurbish the Plant. Rather, the district court found that Zebe's conduct and statements created "an implied agreement to pay Clayson's refurbishment expenses when he transferred operation of the Plant and restaurant to [Zebe] on October 8, 2008." Thus, this Court must determine whether there is substantial and competent evidence to support the district court's finding that the parties' conduct gives rise to the inference that Clayson relinquished involvement in the operation of the restaurant and Plant and that Zebe promised to pay Clayson's expenses.[1] We hold that the district court's finding of an implied-in-fact contract based upon this conduct is not in error because it is supported by substantial and competent, although conflicting, evidence.

Clayson testified that on October 8, 2008, Rick agreed to reimburse Clayson for his expenses, but would only do so if Clayson relinquished control of the property to Rick and Don:

> **Q.** [cross-examination] Right. So you agree with me, October 8, 2008, you called Rick Lawson and told him that you did not have the money to make the payroll.
> **A.** Yes.
> **Q.** You told him that you were done and that if they wanted it, they could take it over.
> **A.** No. I didn't tell him I was done. He said if I'm going to make payroll and make - you know, pay these other bills that you've incurred, I want to have control of the plant - of the restaurant.
> **Q.** And so you were done?

---

[1] The district court's memorandum decision is somewhat unclear on the implied promises that resulted in the implied-in-fact contract. As noted, the district court stated only that there was an implied agreement to reimburse Clayson "when he transferred operation" of the property to Zebe. However, the court's findings of fact suggest that Zebe agreed to assume responsibility for Clayson's ongoing obligations and reimburse him for his provable expenses if he would remove himself from the deal to purchase and operate the Plant, which apparently included Clayson's removal from SVC.

**A.** I relinquished at that point and said go ahead.

Rick disputed this account, testifying that the phone call on that day did not include any agreement to reimburse Clayson:

> **Q.** [direct examination] Tell me what you recall Mr. Clayson telling you on October 8, 2008, in that phone conversation.
> **A.** He called me and said that he did not have the money to pay payroll, which was due on Friday, and that if we were interested in getting involved in the place over there ourselves, that we should put some money in and take over the restaurant because he was done.
> **Q.** So what did you do in response to that phone call?
> **A.** Well, I called Don up and I told him about the phone call and I said, you know, if we want to get involved in that, we can go - and I related what the phone conversation was with Gaylen.

However, Rick also admitted that he and Don agreed that Clayson would not be involved in their future plans:

> **Q.** Beginning with the phone call on October 8, 2008, what did you and Mr. Zebe decide to do concerning that restaurant?
> **A.** We decided that we would - we would take over the restaurant and if we could get permission from Morris Farinella - because we understood that he owned it - but we were not going to move forward with Gaylen Clayson involved.

Clayson further testified that after that conversation with Rick, he had a meeting with Don and Rick together where they both agreed to reimburse him for his expenses:

> **Q.** [direct examination] Did Mr. Zebe or Mr. Lawson ever indicate to you that they would reimburse you for the out-of-pocket expenses that you have incurred in getting the cheese plant ready to - refurbished and ready to run?
> **[The court overrules an objection by Zebe's attorney.]**
> THE WITNESS: Yes.
> **Q.** BY MR. ATKIN: Who is that indicated that to you? Mr. Zebe?
> **A.** We were in a meeting. Both of them indicated that.
> **Q.** When did that take place?
> **A.** That was the first part of October.
> **Q.** Okay.
> **A.** Around the 10th.
> . . .
> **Q.** BY MR. ATKIN: During that meeting who is it that indicated to you that you'd be reimbursed for your out-of-pocket expenses?
> **A.** Rick and Don.
> **Q.** Both of them?
> **A.** Yes.
> **Q.** What did Rick say in that regard?

6

**A.** He said that when we get our funding we'll reimburse you back on what you've spent.

**Q.** What did Don say in that regard?

**A.** He agreed with him that's what they would do.

. . .

**Q.** [re-direct] What was the understanding, Mr. Clayson, between you and the defendants about the work that you had done from July to October while you were there at the plant?

**[The court overrules an objection by Zebe's attorney.]**

THE WITNESS: That they would reimburse me for what I had put in it as soon as they got financed.

In contrast, Don testified that Clayson did not ask for reimbursement until November 2008, when Clayson asked Zebe to agree to the reimbursement before he assigned the Agreement. However, Don's earlier deposition testimony was that he could not remember when Clayson had asked for reimbursement, but when Clayson did ask, Don "answered that question by saying we wanted invoices to prove that the work had been done. . . . And without invoices, without canceled checks, we were not going to reimburse him a dime."

As the district court acknowledged, there is conflicting evidence in this case, and Zebe denies any agreement to reimburse Clayson. However, even where the evidence is conflicting, it may still be substantial and competent, and it is for the district court to weigh the evidence and judge the credibility of witnesses. *Fox*, 137 Idaho at 706-07, 52 P.3d at 851-52 (citation omitted). Further, the district court's findings of fact are to be "liberally construed on appeal in favor of the judgment entered." *Id.* at 706, 52 P.3d at 851.

Here, the district court found Don's deposition testimony more credible than his later denials, "particularly in light of" the other evidence. This other evidence consisted of several statements Don made after October 8, 2008. First, on January 14, 2009, Don sent an email (copied to Rick) to the real estate agent handling the sale of the Plant and stated that "[o]nce we close we are prepared to absorb what we have paid in and most of what was done while Gaylen was in charge, i.e. electrical, plumbing, to the tune of 245k." Second, Zebe's business plan, prepared as part of Zebe's effort to obtain financing to purchase the property, contained a statement that SVC had paid $225,000 for electrical work at the Plant. While Clayson had paid for some electrical work, SVC had not actually paid any of the $225,000. Even though Clayson was not a member of SVC when this business plan was written, Don testified that this statement

7

did not reflect an agreement to reimburse Clayson, but rather was "an outright misrepresentation" to the bank.

Additionally, Don sent three emails (also copied to Rick) to Dairy Systems, suggesting that Zebe would pay Dairy Systems for the work it had done for Clayson. First, Don emailed Dairy Systems on February 19, 2009, stating that Zebe would "be funded" once the title company finalized the transaction. The court inferred from this email that Don was "stating an intent to pay Dairy Systems at least some amount." In an email one week later, Don told Dairy Systems that "we will pay for work that is accepted. We will pay for material used only. . . . The amounts will be calculated and subtracted from the [$50,000] that you have been paid, what is remaining is what will be paid." Finally, in a March 7, 2009 email to Dairy Systems, Don offered to pay a portion of the bill Clayson incurred while operating the facility.

Zebe argues that no legal authority supports the district court's use of statements made "after the fact" to establish an implied-in-fact contract. This argument also misses the mark. The district court found that Lawson's statements to Clayson on October 8, 2008, and Clayson's subsequent "performance" were sufficient to support the inferences required to find an implied-in-fact contract. The court stated that the after-the-fact statements, including the business plan and emails, "confirmed" the agreement and tended to make Zebe's deposition testimony more credible than his later denials. Thus, while the district court relied on "after the fact" statements, it did so in order to evaluate the credibility of the witnesses, which is clearly permissible.

### 2. The district court properly applied the law regarding implied-in-fact contracts.

Zebe also argues that the district court erred in finding an implied-in-fact contract because the evidence does not show that Zebe and Clayson had a common understanding as to which expenses or amounts would be reimbursed, and the damages are therefore speculative. We find this argument to be without merit. Zebe attempts to incorporate the law of express contracts into the analysis of an implied contract, contending that Clayson must prove all the elements of a contract, including a common understanding of all the terms. However, as already noted, an implied-in-fact contract is "one where the terms and existence of the contract are manifested by the conduct of the parties . . . ." *Fox*, 137 Idaho at 708, 52 P.3d at 853 (quoting *Farnworth v. Femling,* 125 Idaho 283, 287, 869 P.2d 1378, 1382 (1994)). The measure of damages under an implied-in-fact contract is quantum meruit, which "permits a party to recover the reasonable value of services rendered or material provided on the basis of an implied promise to pay." *Gray*

8

*v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 387, 210 P.3d 63, 72 (2009) (citing *Cheung v. Pena,* 143 Idaho 30, 35, 137 P.3d 417, 422 (2006)). Thus, once the court determines that an implied-in-fact contract exists, the recovery is restricted to the reasonable value of the services rendered in exchange for the promise.

In this case, the court determined that Zebe agreed to reimburse Clayson "for the expenses shown to be incurred in refurbishing the Plant." While neither party may have known the exact amount of those expenses at the time the implied contract was formed or precisely which items of refurbishment would be reimbursed, the "basis" of the implied promise to pay was the expenses Clayson incurred. In its findings of fact, the district court reviewed Clayson's claimed expenses and determined that Clayson had proved $97,954.23 in expenses. We hold that the evidence supports the inference that the parties had an implied agreement regarding the amount that Zebe promised to pay: the refurbishment expenses that Clayson could prove.

Finally, Zebe argues that there cannot be an implied-in-fact contract because Clayson's assignment of the Agreement is an express contract covering the same subject matter. Zebe relies on this Court's statement that "[e]quity does not intervene when an express contract prescribes the right to compensation." *Vanderford Co., Inc. v. Knudson*, 144 Idaho 547, 558, 165 P.3d 261, 272 (2007). Thus, Zebe argues, because the assignment was part of the series of events by which Clayson transferred operation of the Plant, the terms of the assignment control Clayson's compensation.

We disagree. The assignment is silent as to consideration. It does not address whether Clayson was to be reimbursed for the expenses he had previously incurred or whether the assignment was a gratuitous act by Clayson. Therefore, we hold that the district court did not err in finding an implied-in-fact contract.

## B. We do not reach the issue of unjust enrichment.

Zebe also appeals the district court's finding of an implied-in-law contract (unjust enrichment). We need not reach this issue because our decision affirming the implied-in-fact contract renders the question moot. "Mootness . . . applies when a favorable judicial decision would not result in any relief." *Zingiber Inv., LLC v. Hagerman Highway Dist.*, 150 Idaho 675, 685, 249 P.3d 868, 878 (2011) (quoting *Fenn v. Noah,* 142 Idaho 775, 779, 133 P.3d 1240, 1244 (2006)), *overruled on other grounds by City of Osburn v. Randel*, 37965, 2012 WL 1434339 (Idaho Apr. 26, 2012). Because we have held that the district court did not err in finding that an

implied-in-fact contract exists, a favorable decision on this issue would not result in any relief for Zebe. Therefore, the issue is moot.

**C. Clayson is entitled to attorney fees on appeal.**

Both parties request attorney fees on appeal. Zebe requests attorney fees under I.C. § 12-120(3), and Clayson requests attorney fees based upon I.C. §§ 12-120(3) and -121. Under either section, only the prevailing party is entitled to attorney fees on appeal. Therefore, because Clayson is the prevailing party, Zebe is not entitled to attorney fees on appeal.

Clayson argues that if he is the prevailing party, he is entitled to attorney fees on appeal under Idaho Code. § 12-120(3) because a commercial transaction is the gravamen of the lawsuit.

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes.

I.C. § 12-120(3). In determining whether to award fees under § 12-120(3), "[i]t has long been held that '[t]he critical test is whether the commercial transaction comprises the gravamen of the lawsuit; the commercial transaction must be integral to the claim and constitute a basis on which the party is attempting to recover.'" *Great Plains Equip., Inc. v. Nw. Pipeline Corp.*, 136 Idaho 466, 471, 36 P.3d 218, 223 (2001) (quoting *Bingham v. Montane Res. Assocs.,* 133 Idaho 420, 426, 987 P.2d 1035, 1041 (1999)).

In this case, Clayson brought his action to recover on a contract under which Zebe promised to reimburse him for refurbishment work on a cheese factory. While the district court determined that there was no express contract, it eventually found for Clayson under the doctrine of implied-in-fact contract, based upon the same circumstances. Thus, a commercial transaction is both integral to the claim and is the basis of Clayson's recovery, and Clayson is entitled to attorney fees under I.C. § 12-120(3).

## IV. CONCLUSION

We affirm the judgment of the district court as to its finding of an implied-in-fact contract and award attorney fees and costs on appeal to Clayson.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.