# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40566

POCATELLO HOSPITAL, LLC, d/b/a
PORTNEUF MEDICAL CENTERS, LLC,

    Plaintiff-Respondent,

v.

QUAIL RIDGE MEDICAL INVESTOR,
LLC,

    Defendant-Appellant,

and

CENTURY PARK ASSOCIATES,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2014 Term

2013 Opinion No. 72

Filed: August 1, 2014

Stephen Kenyon, Clerk

---

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Hon. Mitchell W. Brown, District Judge.

The judgment of the district court is <u>affirmed</u>.

Beard St. Clair Gaffney PA, Idaho Falls, for appellant. John M. Avondet argued.

Merrill & Merrill, Chartered, Pocatello, for respondent. Kent L. Hawkins argued.

---

HORTON, Justice.

This appeal stems from a 1983 Ground Lease of 4.25 acres of property in Pocatello, Idaho which Quail Ridge Medical Investors, LLC (Quail Ridge) leases from Pocatello Hospital, LLC d/b/a/ Portneuf Medical Centers, LLC (PMC). Quail Ridge appeals from a declaratory judgment entered by the district court which held that PMC is entitled to an adjustment in the annual rent owed by Quail Ridge from $9,562.50 annually to $148,500 annually, and that Quail Ridge is obligated to pay PMC $416,812.50 in rent for the period of 2010 to 2012. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Despite several transfers of interests in the property, the relationship of the parties is both undisputed and straightforward. PMC owns 4.25 acres of property in Pocatello. Quail Ridge is leasing the real property from PMC and is the owner of the building on the leased land. PMC is the lessor and Quail Ridge is the lessee, each as successors in interest, under the Ground Lease Agreement of 1983 (the Lease).

In 1983, Intermountain Health Care, Inc. (IHC) and Sterling Development Co. (Sterling) entered into the Lease whereby IHC leased the subject real property, as Lessor, to Sterling, as Lessee.[1] The Lease provides that rent is to be paid annually and that the annual rent is to be calculated as 15 percent of the value of the land. The Lease provided that the land was to be assigned a value of $15,000 per acre (for a total of $9,562.50 per year) for the first three years.

Critically, section 1.3(b) of the Lease provides for periodic adjustments to the rent:

> [1.3](b) <u>Adjustments Based on Property Value</u>. The annual net rental as set forth above shall be adjusted every three (3) years beginning on the Commencement Date of this Lease, referred to below as the rental adjustment date.

> The parties' written agreement within ninety (90) days before the applicable rent adjustment date shall be a conclusive determination between the parties of the fair market value for the period to which the adjustment applies. If the parties have not so agreed by the applicable rent adjustment date, the determination shall be made as in the paragraph on Arbitration in Article 13.

> The rent as adjusted shall be equal to fifteen percent (15%) percent [sic] of the fair market value of the leased land, exclusive of the improvements on the premises. Determination of fair market value shall be based on the highest and best use of the land on the applicable rent adjustment date without taking the leasehold into account. The determination shall take into account the parties' agreement that the initial minimum rent is the above-stated percentage applied to a fair market value of Fifteen Thousand and No/100 Dollars ($15,000.00) per acre and shall also take into account any determinations of market value made under this lease for the purpose of adjustments for periods preceding the applicable rent adjustment date.

> If the determination of adjusted rent is made after the applicable rent adjustment date, lessee shall continue to pay rent at the rate applicable to the preceding period until the adjusted rate is determined. The party indebted shall, promptly after the determination, pay any difference for the period affected by the adjustment.

---

[1] The Lease was for a term of thirty years with one option to extend the term by ten years, this option was exercised and assigned to Quail Ridge. Thus, the Lease will be in effect until January 31, 2023.

Thus, under the terms of the Lease, there were to be adjustments to the rent in 1986, 1989, 1992, 1995, 1998, 2001, 2004, 2007, and 2010. However, IHC and Sterling never adjusted the rent.

In 1996, Pocatello Medical Investors (PMI) became a subtenant of Sterling, with an option to purchase, and began operating the building located on the leasehold. In connection with this sublease, IHC (as Landlord), Sterling (as Tenant), and PMI (as Subtenant), entered into a Landlord Consent and Estoppel Certificate (1996 Estoppel Certificate). The 1996 Estoppel Certificate incorporated the Lease and provided that the rent was "currently" $9,562.50 per annum and that "[u]nder Section 1.3(b) of the Lease, the rent shall be adjusted on the next rent adjustment date, March 1, 1998." Despite this language, IHC did not subsequently seek a rent adjustment.

Around 2001, Sterling agreed to sell the building located on the leasehold to PMI. In order to facilitate this transaction, PMI created a new entity, Quail Ridge. Quail Ridge purchased the building from Sterling and assumed the Lease with IHC. Quail Ridge also assumed a $2.8 million dollar loan made by the Public Employee Retirement System of Idaho (PERSI) to Sterling in 1996 that was secured by a deed of trust to the building on the leased property. PMI became the subtenant of Quail Ridge.

In connection with this change, IHC[2] (as Landlord), Sterling (as Tenant), Quail Ridge (as Successor Tenant), and PMI (as Subtenant) all signed another Landlord Consent and Estoppel Certificate (hereinafter 2001 Estoppel Certificate) which was acknowledged and consented to by PERSI. The 2001 Estoppel Certificate was drafted by Richard Faulkner, who was counsel for Quail Ridge at the time. The 2001 Estoppel Certificate stated that the Lease was in full force and effect and that rent was $9,562.50 per annum. Also included in the 2001 Estoppel Certificate was a personal guarantee by Forrest Preston, a principal of Quail Ridge, for "payment and performance of any and all obligations" of Quail Ridge and PMI under the Lease.

In February 2009, shortly after PMC acquired the property and assumed IHC's rights and duties under the Lease, PMC began to investigate the possibility of a rent adjustment pursuant to section 1.3(b) of the Lease and had the 4.25 acres appraised. In October, 2009, PMC notified Quail Ridge of its intention to adjust the annual rent pursuant to the Lease. After the parties failed to reach an agreement, PMC filed its complaint alleging breach of contract and seeking a

---

[2] IHC had since changed hands, and IHC Health Services, Inc., was the successor in interest under the Lease as the Lessor. Because there was no substantive change with this transfer, IHC Health Services will also be referred to as IHC.

3

rent adjustment for 2007 and 2010. The parties waived the mandatory arbitration provision of the Lease and asked the court to determine the "fair market value" of the land to determine the rent obligation. The parties then filed cross-motions for summary judgment; both motions were denied.

PMC subsequently amended its complaint, asserting a claim for declaratory relief regarding the parties' rights under section 1.3(b) of the Lease. Prior to the trial, the district court concluded, as a matter of law, that the 2001 Estoppel Certificate was unambiguous, but that portions of section 1.3(b) of the Lease were ambiguous and warranted admission and consideration of extrinsic evidence regarding the intent of, and course of dealing between, the parties. A two day court trial was held in May of 2012. At the close of PMC's case in chief, Quail Ridge moved to dismiss PMC's breach of contract claim. PMC did not oppose the motion and the motion was granted. Thus, the only issue before the district court for decision was PMC's declaratory judgment claim.

In October 2012, the district court issued its decision. The district court concluded that section 1.3(b) of the Lease was ambiguous in part but that there was no credible evidence to aid it in the interpretation of the ambiguous language. As a result, the district court applied the current fair market value of the land to determine the annual rent. The district court concluded that the value of the land in 2010 was $232,941.18 per acre, making the annual rent $148,500 per year for the three year period of 2010, 2011, and 2012. The district court further found that PMC was not entitled to retroactive modification of the rent in 2007 because PMC failed to make a timely request for modification under the terms of the Lease.

In reaching these conclusions, the district court decided that the 2001 Estoppel Certificate did not modify the terms of the Lease and that PMC did not waive the rent adjustment provision in section 1.3(b) of the Lease. Based upon these findings, the district court considered the rent due per year, $148,500, less the $9,562.50 per year that Quail Ridge had paid for 2010, 2011, and 2012, and determined Quail Ridge was obligated to pay PMC a total amount of $416,812.50. The district court entered its Declaratory Judgment on November 26, 2012. Quail Ridge timely appealed.

## II. STANDARD OF REVIEW

When reviewing a trial court's decision following a bench trial, this Court's review is limited to determining the following:

4

[W]hether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. A district court's findings of fact in a bench trial will be liberally construed on appeal in favor of the judgment entered, in view of the district court's role as trier of fact. It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses. We will not substitute our view of the facts for the view of the district court. Instead, where findings of fact are based on substantial evidence, even if the evidence is conflicting, those findings will not be overturned on appeal. We exercise free review over the lower court's conclusions of law, however, to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found.

*Clayson v. Zebe*, 153 Idaho 228, 232, 280 P.3d 731, 735 (2012) (quoting *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 706–07, 52 P.3d 848, 851–52 (2002)).

"This Court reviews a trial court's determination regarding the admissibility of expert testimony for abuse of discretion." *Chapman v. Chapman*, 147 Idaho 756, 759, 215 P.3d 476, 479 (2009). "When reviewing a claimed abuse of discretion, our sequence of inquiry is: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Id.* at 760, 215 P.3d at 480.

### III. ANALYSIS

**A. The district court did not abuse its discretion in admitting the testimony of PMC's appraiser.**

Brad Janoush testified for PMC at trial regarding the value of the land subject to the Lease. The district court admitted Janoush's testimony over Quail Ridge's objection that Janoush's opinion lacked foundation. Quail Ridge argues that, because Janoush's opinion did not take into account the language of the Lease, his opinion was not based on the facts of the case and was therefore inadmissible. We disagree.

The admissibility of expert testimony is governed by I.R.E. 702, which provides that an expert witness may testify and offer opinions regarding specialized knowledge that will "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." I.R.E. 702. To be admissible, "[t]he information, theory or methodology upon which the expert's opinion is based need not be commonly agreed upon by experts in the field, but it must have sufficient indicia of reliability to meet I.R.E 702 requirements." *City of McCall v. Seubert*, 142 Idaho 580, 585, 130 P.3d 1118, 1123 (2006) (quoting *State v. Konechny*, 134 Idaho 410, 417, 3 P.3d 535, 542 (Ct.

App. 2000)). Expert testimony "which is speculative, conclusory, or unsubstantiated by facts in the record" is of no assistance to the trier of fact and as such, is inadmissible. *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 838, 153 P.3d 1180, 1184 (2007). However, the fact that a party disagrees with an opposing party's expert, or the means by which the expert reached his or her conclusion, does not necessarily mean that the expert's opinion is inadmissible. *See City of McCall*, 142 Idaho at 586, 130 P.3d at 1124. Because expert testimony is introduced to assist the trier of fact, the task of weighing an expert's testimony is dedicated to the trier of fact. *Id.*

Here, Janoush testified that, in his opinion, the market value of the property without improvements on January 27, 2010, was $990,000. Janoush did not look at or use the Lease in his appraisal of the property. Quail Ridge's objection stems from the fact that Janoush was assessing the traditional fair market value of the property which, under Quail Ridge's theory of the case, does not account for the language in section 1.3(b) of the Lease requiring that the determination of the market value of the land "shall take into account the parties' agreement that the initial minimum rent" was 15 percent of $15,000 per acre and take into account "any determinations of market value made under this lease." Quail Ridge does not question the principles or methodology Janoush relied upon to reach the 2010 appraisal value. Rather, Quail Ridge seeks to have the opinion excluded because it differs from Quail Ridge's view of the appropriate valuation methodology.

The district court specifically addressed Quail Ridge's concerns and stated:

> The court is mindful of the fact that it has been and continues to be [PMC's] position that the way this court should interpret [section 1.3(b) of the Lease] is that it is fair market value and there is no other intent of the parties regarding that provision of the lease agreement. Based upon that, I do believe that the testimony of Mr. Janoush, which supports [PMC's] arguments in this respect is relevant to these proceedings and the issue of whether or not he considered the entirety, or even any portion of the ground lease agreement in formulating his opinions regarding fair market value, in this court's mind goes to weight rather than to the admissibility of his testimony.
>
> I do believe that there has been appropriate foundation laid for his testimony . . . I do believe that the issue being raised in this matter is more appropriately one addressed to the weight, if any, that this court as the fact finder should give to this particular testimony based on the fact that it did not consider the language in the Ground Lease Agreement.

We agree with the district court's analysis. Quail Ridge has failed to show that Janoush's testimony was unsubstantiated. Rather, Quail Ridge merely argues that its suggested method of

6

valuing the property is more appropriate. This determination was within the province of the district court, sitting as the trier of fact.

A review of the record illustrates that the district court was aware of the proper standards for admissibility of an expert's opinion under I.R.E. 702, and that the district court acted within the boundaries of its discretion by observing that Janoush's opinion as to the value of the leased property was not based on a flawed methodology, but simply one with which Quail Ridge disagreed. As this is a well-reasoned conclusion, the district court did not abuse its discretion by admitting Janoush's testimony.

**B. Quail Ridge failed to establish an affirmative defense to enforcement of the Lease.**

Quail Ridge argues that its defenses of estoppel, modification, and waiver are dispositive of this appeal, as this Court should hold that one, if not all, of these affirmative defenses prevent PMC from adjusting the rent under section 1.3(b) of the Lease.[3] Because the district court properly articulated the law applicable to each affirmative defense, and because there is substantial and competent evidence to support the district court's findings of fact in relation to each of these affirmative defenses, we uphold the district court's conclusion that Quail Ridge did not establish a defense to PMC's enforcement of the rent adjustment provision of the Lease.

**1. The 2001 Estoppel Certificate does not estop PMC from seeking a rent adjustment.**

The district court determined the 2001 Estoppel Certificate was unambiguous and that nothing in the 2001 Estoppel Certificate gave "any indication whatsoever that the 1983 lease agreement has been modified in any way, shape, or form." Nevertheless, Quail Ridge argues that the 2001 Estoppel Certificate serves to estop PMC from attempting to adjust the rent as it is consistent with the parties' course of performance, which Quail Ridge argues is paying a fixed rent of $9,562.50. PMC argues that the plain language of the 2001 Estoppel Certificate did not modify the Lease to eliminate the rent adjustment or the provision that the annual rent be 15 percent of the market value of the land. To the contrary, PMC asserts that the 2001 Estoppel Certificate explicitly provided that it was not intended to modify the Lease.

"When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law." *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108

---

[3] Quail Ridge argues that IHC and Bannock County, PMC's predecessors in interest of the Lease, waived or modified provisions of the Lease. Because PMC is the successor in interest to the Lease, subsequent references to PMC in section III of this Opinion will refer to the conduct and intentions of PMC's predecessors in interest as well as PMC.

P.3d 332, 337 (2005) (quoting *Lamprecht v. Jordan, LLC*, 139 Idaho 182, 185, 75 P.3d 743, 746 (2003)). "An unambiguous contract will be given its plain meaning." *Id.* An estoppel certificate is "[a] signed statement by a party (such as a tenant or a mortgagee) certifying for another's benefit that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. A party's delivery of this statement estops that party from later claiming a different state of facts." BLACK'S LAW DICTIONARY 6319 (9th ed. 2009). However, "an adverse party may not use an estoppel certificate as a device to make undisclosed changes to [a] lease." *K's Merch. Mart, Inc., v. Northgate Ltd.*, 835 N.E. 2d 965, 972 (Ill. App. Ct. 2005). In other words, if an estoppel certificate does not explicitly modify the terms of the lease, it is not a mechanism by which a lease agreement may be modified.

Here, the relevant language of the 2001 Estoppel Certificate provides:

2. The Lease is in full force and effect, is valid and enforceable in accordance with its terms and has not been terminated. Except as otherwise referenced herein, the Lease constitutes the only agreement of any kind or nature between [IHC] and [Sterling] related to the Demised Premises. [IHC] is the current holder of all the lessor's right, title and interest under the Lease.

. . . .

5. Under the Lease, [Sterling] is obligated to pay rent at the rate of NINE THOUSAND FIVE HUNDRED AND SIXTY TWO DOLLARS AND FIFTY CENTS ($9,562.50) per annum. Rent has been paid through and including FEBRUARY 28, 2001.

. . . .

[IHC's] consent to the assignment and assumption and/or to the sublease as set forth herein shall not constitute or be construed as . . . (b) a waiver or modification by [IHC] of [Sterling's] duties or obligations under the Lease, or excuse [Sterling's] performance of any term or condition of the Lease, and/or (c) a waiver or modification by [IHC] of any of its rights under the Lease . . . .

Quail Ridge argues that paragraph five fixes the rent at $9,562.50 and does not contemplate future rent adjustments. Thus, Quail Ridge argues, PMC is estopped from enforcing section 1.3(b) of the Lease. There is no language in the 2001 Estoppel Certificate which serves to establish a fixed rent nor is there any explicit modification of the rent adjustment language of the Lease. Rather, the plain language of paragraph two explicitly states that the Lease is in full force and effect. The express language of the 2001 Estoppel Certificate provides that the parties' rights and obligations under the Lease were not modified. The only effect of the 2001 Estoppel Certificate was to estop IHC from bringing a claim for breach of contract based upon events

8

prior to its execution. Based on the plain, unambiguous language of the 2001 Estoppel Certificate, PMC is not estopped from enforcing the rent adjustment provision of the Lease.

### 2. The parties did not modify the Lease.

The district court found that the parties did not modify the terms of the Lease so as to create a fixed rent. On appeal, Quail Ridge makes two arguments that the Lease was modified; first, that the 2001 Estoppel Certificate was a mutually assented to modification of the Lease's rent adjustment provision; and second, that PMC's conduct after the execution of the 2001 Estoppel Certificate demonstrated a modification implied from the conduct of the parties. PMC argues that, because there is no evidence of a meeting of the minds regarding modification, the Lease was not modified. We agree.

"[T]his Court has recognized that a contract may be modified by mutual consent." *Watkins Co., v. Storms*, 152 Idaho 531, 536, 272 P.3d 503, 508 (2012). For modification to take place, "the minds of the parties must meet as to any proposed modification" and the parties must assent to the modification. *Ore-Ida Potato Prods., Inc. v. Larsen*, 83 Idaho 290, 296, 362 P.2d 384, 387 (1961). "One party to a written contract cannot alter the terms of the contract . . . ." *Great Plains Equip., Inc., v. Nw. Pipeline Corp.*, 132 Idaho 754, 769, 979 P.2d 627, 642 (1999). "The fact of agreement may be implied from a course of conduct in accordance with its existence and assent may be implied from the acts of one party in accordance with the terms of a change proposed by the other." *Ore-Ida Potato*, 83 Idaho at 296, 362 P.2d at 387. However, without a meeting of the minds, the conduct of the parties cannot establish a modification. *Watkins*, 152 Idaho at 536, 272 P.3d at 508.

In *Watkins*, a lease between the parties provided that "each party specifically waives the right to a jury trial," and contained a clause dictating that the lease could only be modified by a writing signed by both parties. 152 Idaho at 535, 272 P.3d at 507. Despite this, when a dispute arose, both parties demanded a jury trial in their pleadings. *Id.* Then, four weeks before trial, the plaintiffs filed a motion to enforce the jury-waiver clause. *Id.* The defendants argued that the clause had been modified by mutual consent through each party's conduct of requesting a jury trial. *Id.* This Court upheld the district court's conclusion that there was no modification of the lease and that the jury-waiver clause was enforceable. *Id.* We noted first that there was no modification that complied with the lease as there was no written agreement to modify signed by both parties. *Id.* Further, we explained that, regardless of the parties' conduct, there must be a

9

meeting of the minds as to the proposed modification. *Id.* at 536, 272 P.3d at 508. Without any evidence that the parties mutually agreed to modify the jury-waiver clause of the lease, their independent conduct was insufficient to demonstrate modification. *Id.*

Here, the Lease contained an Amendment of Lease provision which stated that "Lessor and Lessee each agree to execute and deliver and to acknowledge if necessary for recording purposes, any agreement necessary to effect such amendment; provided, however, such amendment shall not in any way affect the term or rent under this lease . . . ." The parties never executed and delivered any agreement regarding an amendment to the Lease. Thus, as in *Watkins*, there was no modification that complied with the Lease's express amendment terms.

Quail Ridge argues that changes from the 1996 Estoppel Certificate to the 2001 Estoppel Certificate reflect the parties' intent to modify the rent adjustment provision of the Lease. The 1996 Estoppel Certificate contained the following language:

> 5. Under the Lease, the Tenant is obligated to pay rent currently at the rate of NINE THOUSAND FIVE HUNDRED SIXTY TWO DOLLARS AND 50/XX CENTS ($9,562.50) per annum. Rent has been paid through and including February 28, 1996. *Under section 1.3(b) of the Lease, the rent shall be adjusted on the next rent adjustment date, March 1, 1998.*

(emphasis added). The 2001 Estoppel Certificate provides:

> 5. Under the Lease, [Sterling] is obligated to pay rent at the rate of NINE THOUSAND FIVE HUNDRED AND SIXTY TWO DOLLARS AND FIFTY CENTS ($9,562.50) per annum. Rent has been paid through and including FEBRUARY 28, 2001.

Quail Ridge contends that the elimination of the "rent shall be adjusted" language from the 1996 Estoppel Certificate reflects the parties' mutual consent to modify the rent adjustment language of the Lease. Richard Faulkner, counsel for Quail Ridge, drafted the 2001 Estoppel Certificate. He testified that he left out the "rent shall be adjusted" language because he wanted to confirm that the parties had waived the right to adjustments through their course of conduct. However, Faulkner admitted that the subject of a rent adjustment was never discussed by the parties. This testimony was consistent with that of Guy Kroesche, counsel for IHC at the time, who testified that he had no recollection that Quail Ridge requested modification of the rent adjustment provision of the Lease.

We agree with the district court's conclusion that Faulkner's unilateral intent to modify the terms of the Lease was insufficient to support Quail Ridge's position. We are in particular

10

agreement with the district court's observation that "removing language that was present in an earlier document and not discussing the same or making the other party aware of its deletion does not establish 'mutual assent.' In fact, some might question the propriety of such conduct." The district court did not err in finding that Faulkner's subjective, undisclosed intent to modify the rent adjustment provision of the Lease by deleting language found in the 1996 Estoppel Certificate was not sufficient evidence of the parties' mutual intent to modify the Lease.

Likewise, we can find no reason to overturn the district court's determination that PMC's conduct following execution of the 2001 Estoppel Certificate was insufficient to demonstrate an implied modification from a course of conduct. Quail Ridge's position is that PMC's failure to invoke the rent adjustment provision after the 2001 Estoppel Certificate was in accordance with the fixed rent proposed by Quail Ridge and thus, amounted to an implied modification. The critical rule of law that underlay our holding in *Watkins* is this: "The fact of agreement *may* be implied from a course of conduct in accordance with its existence and assent *may* be implied from the acts of one party in accordance with the terms of a change proposed by the other." 152 Idaho at 536, 272 P.3d at 508 (quoting *Ore-Ida Potato*, 83 Idaho at 296, 362 P.2d at 387) (emphasis added). Our use of the permissive "may," rather than the mandatory "shall," should be understood as meaning that the trier of fact is *permitted* to infer mutual intent based upon the parties' subsequent conduct, however, the trier of fact is not *required* to infer mutual intent. Here, Quail Ridge admitted that it did not discuss modification of the rent amount or modification of the rent adjustment provisions of the Lease with PMC. Absent such discussions, PMC's failure to exercise its rights under the Lease is not conclusive evidence of mutual intent to modify the Lease. Consequently, we uphold the district court's determination that Quail Ridge failed to prove that the parties had agreed to modify the Lease.

**3. PMC did not waive its right to seek an adjustment in rent under the Lease.**

The district court determined that there were no facts to support the claim that PMC voluntarily and intentionally waived a known right. Instead, the district court found that IHC, PMC's predecessor in interest, through poor management and oversight, had simply neglected to seek rent adjustments. Quail Ridge argues that PMC waived the right to adjust the rent by failing to invoke the rent adjustment provision at any point between 1983 and 2009 and that Quail Ridge detrimentally relied on PMC's waiver of the rent adjustment provision by investing heavily in

the property and providing Preston's personal guarantee. PMC responds that Quail Ridge failed to show evidence of a clear and unequivocal act of waiver.

"A waiver is a voluntary, intentional relinquishment of a known right or advantage . . . ." *Knipe Land Co. v. Robertson*, 151 Idaho 449, 457, 259 P.3d 595, 603 (2011) (quoting *Fullerton v. Griswold*, 142 Idaho 820, 824, 136 P.3d 291, 295 (2006)). "Waiver is foremost a question of intent" and the party proving waiver is required to show a clear intent to waive. *Id.* (quoting *Seaport Citizens Bank v. Dippel*, 112 Idaho 736, 739, 735 P.2d 1047, 1050 (Ct. App. 1987)). Waiver will not be inferred from the parties' conduct absent "a clear and unequivocal act manifesting an intent to waive, or from conduct amounting to estoppel." *Id.* at 458, 259 P.3d at 604 (quoting *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 256, 846 P.2d 904, 907 (1993)). Importantly, the party asserting waiver must also "show that he acted in reasonable reliance upon [the waiver] and that he thereby has altered his position to his detriment." *Id.* at 457, 259 P.3d at 603 (quoting *Fullerton*, 142 Idaho at 824, 136 P.3d at 295) (silence insufficient to show intent to waive); *see also Magic Valley Foods, Inc. v. Sun Valley Potatoes, Inc.*, 134 Idaho 785, 788, 10 P.3d 734, 737 (2000) (concluding waiver was not established when seller failed to show detrimental reliance on buyer's waiver of payment term); *Panorama Residential Protective Assoc. v. Panorama Corp. of Wash.*, 640 P.2d 1057, 1060–61 (Wash. 1982) (concluding that when lease called for rent adjustments every two years and landlord failed to adjust rent for many years by the terms of the lease, the landlord waived the right to past adjustments but not future adjustments).

Quail Ridge presented no direct evidence that PMC voluntarily and intentionally waived its right to increase the rent under section 1.3(b) of the Lease. Substantial and competent evidence showed that IHC's failure to exercise its rent adjustment rights under the Lease was a product of neglect, rather than intent. Accordingly, we affirm the district court's conclusion that Quail Ridge failed to establish its defense of waiver.[4]

---

[4] Quail Ridge asserts that "[d]etrimental reliance may establish waiver." This is an inaccurate statement of law. Detrimental reliance is one of two elements of a claim of waiver. Quail Ridge cited the Court of Appeals' decision in *Clearwater Minerals Corp. v. Presnell*, 111 Idaho 945, 729 P.2d 420 (Ct. App. 1986), in support of its assertion. Even a casual reading of *Clearwater Minerals* reveals the fallacy of Quail Ridge's claim. The word "detriment" appears once in the body of the opinion: "Waiver is a voluntary, intentional relinquishment of a known right or advantage. The party asserting the waiver must show that he acted in reasonable reliance upon it and that he thereby has altered his position to his detriment." *Id.* at 949-50, 729 P.2d at 424-25 (citing *Brand S Corp. v. King*, 102 Idaho 731, 639 P.2d 429 (1981); *Scott v. Castle*, 104 Idaho 719, 662 P.2d 1163 (Ct.App.1983)). *Clearwater Minerals* also used the derivative adjective "detrimental" once: "Furthermore, the Presnells have shown no detrimental reliance upon any purported waiver." *Id*. at 950, 729 P.2d at 425.

**C. There is substantial and competent evidence to support the district court's interpretation of the ambiguous language of the Lease.**

Because no affirmative defenses prevent PMC from enforcing the language of the rent adjustment provisions in the Lease, the issue becomes whether the district court properly interpreted the relevant language of the Lease. Section 1.3(b) provides:

> The rent as adjusted shall be equal to fifteen percent (15%) percent [sic] of the fair market value of the leased land, exclusive of the improvements on the premises. Determination of fair market value shall be based on the highest and best use of the land on the applicable rent adjustment date without taking the leasehold into account. The determination shall take into account the parties' agreement that the initial minimum rent is the above-stated percentage applied to a fair market value of Fifteen Thousand and No/100 Dollars ($15,000.00) per acre and shall also take into account any determinations of market value made under this lease for the purpose of adjustments for periods preceding the applicable rent adjustment date.

The district court determined that the first sentence in this paragraph was unambiguous, but that the last two sentences were ambiguous. Quail Ridge does not dispute this conclusion. In interpreting this language, the district court held that "(1) because there is no evidence to establish how the original [$15,000] figure was reached; and (2) because there is no evidence to establish a course of dealing to establish what construction the parties intended to give the language related to subsequent adjustments, the court will disregard these provisions of the Lease" and apply the current fair market value of the 4.25 acres.

Quail Ridge argues that the district court erred by disregarding the "take into account" language when making its value determination and by failing to find a course of dealing between the parties. Quail Ridge's position is that if the district court had taken into account the fact that the rent was originally set at 15 percent of $15,000 per acre, the "fair market value" of the leased land in 2010 would be the original $15,000 per acre, adjusted for the change in the value of the land since the last scheduled adjustment in 2007. Thus, Quail Ridge argues that since the value of the land had gone down between 2007 and 2010, the value of the land should be less than the

---

The two elements of a waiver claim, intentional relinquishment of a known right or advantage and detrimental reliance, identified in *Clearwater Minerals* is entirely consistent with the decisions of this Court. *See Washington Fed. Sav. v. Van Engelen*, 153 Idaho 648, 655, 289 P.3d 50, 57 (2012); *Knipe Land Co.*, 151 Idaho at 457–58, 259 P.3d at 603–04; *Fullerton*, 142 Idaho at 824, 136 P.3d at 295. This Court has never held that detrimental reliance, standing alone, is sufficient to establish a claim of waiver.

Although Quail Ridge is correct in observing that the district court did not address its claim of detrimental reliance, the failure to establish that PMC intentionally relinquished a known right or advantage was fatal to its defense based on waiver.

13

original $15,000 per acre, completely disregarding the change in land values from 1983 to 2007. Quail Ridge further argues that the district court should have taken into account the fact that the rent was never increased[5] and that the rent remained constant at $9,562.50 when the estoppel certificates were executed in 1996 and 2001. PMC counters that the district court properly disregarded the "take into account" language because there was no evidence to establish helpful values to "take into account."

Whether a contract is ambiguous or unambiguous is a question of law. *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005) (quoting *Lamprecht v. Jordan, LLC*, 139 Idaho 182, 185, 75 P.3d 743, 746 (2003)). If a contract is ambiguous, "its interpretation is a question of fact." *Id.* "The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole." *Id.* This Court also considers the circumstances under which the contract was made, "the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings. A party's subjective, undisclosed intent is immaterial to the interpretation of a contract." *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006).

We first consider Quail Ridge's argument that PMC's repeated failure to seek a rent increase from 1983 to 2009 constituted a course of dealing that should have been considered when deciding the intent of the parties under section 1.3(b) of the Lease. A course of dealing is a pattern of conduct between the parties that may be used as evidence of how the parties intended the contract to be interpreted; it is evidence of the construction the parties placed on the language of the contract. *See, e.g.,* I.C. § 28-1-303(b) (general rules for Uniform Commercial Code); *City of Meridian v. Petra Inc.*, 154 Idaho 425, 439, 299 P.3d 232, 246 (2013). The lack of rent adjustments does not provide insight into how the parties interpreted the language of section 1.3(b), as the parties had never applied the language at issue. In the absence of an application of section 1.3(b), there is simply no inference to be drawn as to how the parties construed this language. We can find no error in the district court's decision in this regard.[6]

---

[5]    We note that section 1.3(b) of the Lease requires that "any determinations of market value made under this lease for the purpose of adjustments" be taken into account. The focus is thus on "determinations of market value," rather than the amount of rent paid.

[6] We note that Quail Ridge offers no explanation as to *how* the district court should have considered the absence of rent adjustments when determining the market value of the land.

Quail Ridge also claims error in the district court's failure to account for the initial valuation of the land in determining its value. The district court received very little evidence on this subject from which it might glean insight into the intent of the parties. The CEO for IHC from 1989 to 2000, Earl Christison, testified that he thought the initial value of $15,000 per acre may have been high, but he also testified that he was only speculating because he had no specific recollection of the creation, terms, or execution of the Lease. Christian Anton, Chief Executive Officer at IHC from 1981 to 1984, testified at his deposition that he thought the original value of the land was set at a "value that seemed reasonable" but also said he had no memory of the circumstances of the Lease. The district court concluded that the testimony on this issue was lacking in credibility and reasoned that there was no reliable evidence to show whether the $15,000 value was a high or low figure, or whether it was chosen as a result of a market analysis. This finding is supported by the evidence, or more accurately the lack thereof, and will not be disturbed.

In short, there was no meaningful evidence presented to the district court which would permit it to take into account either the initial or (non-existent) subsequent valuations when determining the value of the land. The district court's choice of words, stating that it was going to "disregard" the ambiguous language, was unfortunate, but not erroneous. Rather, it is clear that the district court thoroughly considered the language of the Lease and found that there was no credible, relevant evidence that would permit him to apply the two considerations that he was to take into account. "It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses." *Clayson v. Zebe*, 153 Idaho 228, 232, 280 P.3d 731, 735 (2012) (quoting *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 706–07, 52 P.3d 848, 851–52 (2002)). Accordingly, we will not disturb the district court's interpretation of the Lease.

## D. PMC is entitled to attorney fees on appeal.

PMC requests attorney fees on appeal under Idaho Code section 12-120(3) and based on the language of the Lease. Quail Ridge argues that PMC cannot be awarded fees because PMC failed to address their request for fees in the argument portion of their brief, as required by I.A.R. 35. PMC did not address their entitlement to attorney fees in the argument section of their brief in violation of I.A.R. 35(b). Nonetheless, PMC requested fees in its statement of the case, and presented citation to authority and argument in support of its request. This Court has held that

both appellant and respondent have the obligation to address attorney fees on appeal in the argument portion of their briefs. *Bagley v. Thomason*, 149 Idaho 799, 805, 241 P.3d 972, 978 (2010). However, we have repeatedly held that when a request for fees is accompanied by citation to authority and argument for the request, we will not deny the request simply based on the location of the argument. *See e.g., Knipe Land Co. v. Robertson*, 151 Idaho 449, 461, 259 P.3d 595, 607 (2011) (analyzing request after concluding the appellants "sufficiently complied with the requirements" of I.A.R. 35(a)(5) despite improper location of their argument); *Mortensen v. Stewart Title Guar. Co.*, 149 Idaho 437, 448, 235 P.3d 387, 398 (2010) (noting that when opposing party was on notice that fees were being requested and the authority for those fees, the lack of compliance with the rules of appellate procedure was not dispositive of the request). Thus, we will consider PMC's request because it sufficiently complied with I.A.R. 35(b) by presenting citation to authority and argument supporting its claim for attorney fees. As PMC is the prevailing party on appeal, PMC is entitled to fees based on the language of section 10.3 of the Lease which provides: "In the event suit shall be brought . . . because of the breach of any other covenant herein contained to be kept or performed, the prevailing party shall be paid a reasonable attorney's fee by the other party."

## IV. CONCLUSION

We affirm the district court's declaratory judgment in favor of PMC. We award attorney fees and costs on appeal to PMC.

Chief Justice BURDICK and Justices EISMANN and J. JONES **CONCUR**.

16